Filed 3/6/26  C.W. v. Superior Court CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| C.W.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>    Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Real Party in Interest. | B350079<br><br>(Los Angeles County Super. Ct. Nos. 22CCJP03433A, 23CCJP00748A) |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.452.)  Lucia J. Murillo, Judge Pro Tempore.  Petition denied.

Law Offices of Vincent W. Davis & Associates and Vincent W. Davis for Petitioner.

No appearance for Respondent.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Real Party in Interest.

Children's Law Center of California – CLCLA 1, Daniel Szrom for Minor A.S.

Children's Law Center of California – CLCLA 3, Sarah Liebowitz for Minor M.S.

_____

C.W. (mother) petitions for extraordinary relief pursuant to rule 8.452 of the California Rules of Court. Mother seeks review of orders terminating her reunification services as to her two young daughters, A.S. and M.S., and setting a permanency planning hearing under Welfare and Institutions Code section 366.26.[1] In her supporting memorandum, mother makes several arguments, many of which we do not address because they either were not raised below or are irrelevant. The arguments we do address concern the juvenile court's adjudication and disposition of a section 387 petition as to A.S. and the court's detriment finding as to both children regarding placement with mother. We conclude substantial evidence supports the court's findings and orders. Thus, we deny the petition.

## FACTS AND PROCEDURAL HISTORY

### 1. The Family

A.S. and M.S. are the daughters of mother and C.S. (father).[2] When the underlying proceedings began in September 2022, A.S. was approximately five months old and M.S. had not yet been born. A.S. and M.S. are both autistic.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Although father was a party to the proceedings below, he is not involved in these writ proceedings and we mention him only to the extent relevant.

Mother and father have a history of domestic violence against each other. They both have been arrested on separate occasions due to violence toward the other. When the underlying proceedings began, neither mother nor father was employed. They were living in a homeless housing project with A.S. and father's minor son from a different relationship. Mother remained unemployed for the duration of the proceedings below.

Mother had no family or support system in California. Mother's main source of support was her stepmother, Denise Marshall, who lived in Georgia. Ms. Marshall had raised mother from the time mother was four years old and for some time had been mother's legal guardian. She supported mother financially and emotionally. Ms. Marshall considered mother as her own daughter and A.S. and M.S. as her granddaughters.

**2.      September 2022: Section 300 Petition as to A.S.**

In September 2022, following a domestic violence incident between mother and father (for which father was arrested), the Los Angeles County Department of Children and Family Services (Department) filed a two-count section 300 petition on behalf of A.S. (A.S. 300 petition). A.S. was five months old at the time and was present during the parents' altercation. The A.S. 300 petition alleged A.S. was at risk due to father's violence against mother and mother's failure to protect A.S. from that violence. A.S. was detained from father and remained with mother under Department supervision. Mother was a few months pregnant at the time.

In October 2022, father was convicted of felony assault with a deadly weapon and placed on formal probation. The criminal court entered a 10-year protective order protecting mother from father.

In November 2022, the juvenile court sustained the A.S. 300 petition and declared A.S. a dependent of the court under subdivisions (a) and (b) of

3

section 300.  The court removed A.S. from father and maintained her placement with mother under Department supervision.  Mother was ordered to complete a domestic violence program for victims, enroll in individual counseling, and abide by any criminal protective order.  Father was granted monitored visits with A.S.

### 3.     2023

In February 2023, mother gave birth to M.S. in a bathtub at the transitional housing facility where she and A.S. were living.  Apparently, no one knew mother was pregnant or had given birth.  At the time, mother was sharing a room with two women.  A few days after mother gave birth, one of her roommates came home and found a naked baby, covered with a blanket, crying in the closet.  No one else was home at the time.  The roommate called 911.

Mother arrived home after one of her roommates called to tell her about the baby.  Mother told law enforcement the baby was her friend Sarah Johnson's baby.  Mother said she had agreed to watch the baby for Ms. Johnson, whom mother had met " 'on the streets.' "  Mother said she did not realize Ms. Johnson "would just come and leave the baby in the room."  Mother "was just trying to be helpful" for her friend.  According to mother, Ms. Johnson was homeless and there was no way to contact her.  Mother reviewed video footage from the housing facility and identified a woman in one video as Ms. Johnson.  As it turned out, however, that person was one of mother's roommates.

### a.     March 2023:  Section 300 Petition as to M.S.

The infant was evaluated at a hospital, where doctors estimated she was seven days old.  Although it appeared she had not been born in a hospital, she was in good health.  In early March 2023, the Department filed

a section 300 petition on behalf of the then still unidentified baby girl, alleging the infant was at risk due to being abandoned by her mother without clothes or any provisions or plan for support. The infant was detained and placed with foster parent K.L. (caregiver).

For weeks, mother repeated the story that her friend was the infant's mother and had left the infant with her without provisions or a plan. Eventually, one of mother's roommates told the Department she had found "blood splashed in the restroom, a bloody rug, a bloody bath towel that was located behind mother's bed, and a pink Minnie Mouse baby floor bouncer covered in dry blood." On March 21, 2023, mother admitted the baby girl was her biological child and father was the biological father. Mother stated she had given birth in the bathtub and hid her infant out of fear. She did not believe she had placed M.S. in danger. Mother missed her baby and wanted her back in her care.

The juvenile court ordered DNA testing, which confirmed mother and father were the infant's biological parents.

### b. March 2023: Section 342 Subsequent Petition as to A.S.

During this same period, the Department had received reports, including video evidence, that mother and father had been seeing each other in violation of the criminal protective order, and mother had allowed father to spend unmonitored time with A.S. in violation of the juvenile court's visitation order. Mother denied she was in contact with father.

Given mother's admissions regarding the circumstances surrounding M.S.'s birth as well as father's contact with both mother and A.S. in violation of court orders, the Department was concerned about A.S.'s safety in mother's care. On March 28, 2023, the juvenile court granted the Department's

5

request for an expedited removal order for A.S. A.S. was placed with caregiver, who also continued to care for M.S.

Soon after, the Department filed a section 342 subsequent petition on behalf of A.S., alleging A.S. was at risk due to the detrimental and endangering situation mother had created as to M.S. (A.S. 342 subsequent petition). At an April 4, 2023 hearing on the A.S. 342 subsequent petition, the juvenile court ordered A.S., who already had been removed from father, detained from mother. The court ordered monitored visits for mother and father.

In May 2023, mother was terminated from her transitional housing program. Mother had violated several house policies, including being picked up and dropped off by a male. Over time, the Department confirmed mother was seeing father in violation of the criminal protective order. Thus, in June 2023, the juvenile court granted the Department's request that visits with the children occur at a Department office. Nonetheless, in August 2023, mother reported she and father were still seeing each other.

### c. June 2023: Amended Petition as to M.S.

In June 2023, after learning mother and father were the parents of M.S., the Department filed an amended petition on behalf of M.S. (M.S. amended petition).[3] The M.S. amended petition included one new count pertaining to mother's conduct surrounding M.S.'s birth and approximate first month of life as well as three new counts pertaining to father's domestic violence against mother, similar to the counts in the A.S. 300 petition.

---

[3] At the time, the child was referred to as Baby Girl Last Name Unknown. On June 29, 2023, the juvenile court officially changed her name to M.S.

In August 2023, the Department reported mother had completed parenting and domestic violence classes and was participating in individual counseling. The Department was awaiting completion letters and certificates. That same month, because mother and father had refused to sign forms for mental health and developmental assessments for the children, the juvenile court designated caregiver as co-educational rights holder for the children.

**d.     September 2023:  Adjudications of A.S. 342 Subsequent Petition and M.S. Amended Petition**

In September 2023, the adjudication and disposition hearings were held for both the A.S. 342 subsequent petition and the M.S. amended petition.  The juvenile court sustained the A.S. 342 subsequent petition, finding A.S. was at risk of harm due to mother's conduct surrounding newborn M.S., and removed A.S. from mother.  As to the M.S. amended petition, the juvenile court sustained two subdivision (b) counts (one pertaining to mother's conduct surrounding M.S.'s birth and first few weeks of life and another pertaining to father's domestic violence against mother), and one subdivision (j) count (pertaining to father's violence against mother). The court dismissed the remaining counts.  The court declared M.S. a dependent of the court and removed her from mother and father.  Both A.S. and M.S. remained placed with caregiver.

The court ordered mother to enroll in a domestic violence support group for victims and a parenting class, undergo a psychological assessment and psychiatric evaluation, and participate in individual counseling.  The Department was given discretion to grant mother credit for programs she already had completed or partially completed.  Monitored visitation was

ordered for mother and father.  The court also ordered mother and father to comply with the criminal protective order.

Mother appealed the court's September 2023 findings and orders as to both A.S. and M.S.  Those appeals were dismissed as abandoned under *In re Phoenix H.* (2009) 47 Cal.4th 835.  (*In re A.S. et al.* (Aug. 16, 2024, B332676).)

### e.  November 2023:  Mother Files, Then Withdraws, Section 388 Petitions

In November 2023, mother filed section 388 petitions asking the juvenile court to return her children to her care.  Mother stated she had "completed all of the court orders."  She provided completion certificates for both a parenting education class and a domestic violence for survivors class conducted by service provider Shields for Families.  She also provided documentation for her participation in individual counseling and a one-hour, telehealth psychiatric evaluation, which concluded with "No assigned diagnoses."  The Department was unable to confirm mother's participation in either the parenting or domestic violence classes.  Indeed, Shields for Families reported mother was not and had never been "a participant at their agency."  In addition, the Department noted its suspicions both that mother may have a mental health "delay" and that, despite her denials, she continued to see father.  The Department also expressed concern that, during visits, mother was "unable to properly care for both children safely."  Mother withdrew her section 388 petitions.

### 4.  2024

### a.  A.S. and M.S.

Throughout 2024, caregiver cared for the children in her home.  The Department consistently reported the children were thriving with caregiver, who affectionately called them " 'my babies.' "

8

In March 2024, the Department reported A.S. had been diagnosed with autism, PICA, speech delay, developmental delays, and aggressive behaviors. Caregiver reported A.S. was nonverbal and displayed concerning behaviors such as eating non-edible items, pulling out hair, lack of eye contact, and difficulty self-soothing. As "treatment required," A.S.'s physician listed the following: speech therapy, occupational therapy, ABA therapy, and well childcare visits. A.S. was receiving regional center services, including mental health services, speech therapy, and occupational therapy. Caregiver attended mental health services with A.S., where they worked on coping strategies and social skills. A.S. showed improvement, although it remained difficult for her to manage "strong emotions" and she was "easily triggered." At one point, there was an interruption in services when vendors were changed and services were moved out of caregiver's home to facilitate mother's participation. A.S.'s therapist reported the disruption in services caused A.S. to regress in her behaviors. The therapist wanted A.S. to have consistency and a safe environment in her life.

**b.    Mother**

In March 2024, mother and father "were involved in an incident" that involved law enforcement being called. Mother refused to discuss what happened and father denied having contact with mother. In May, although mother denied any contact with father, the Department remained concerned they were still involved.

In early April 2024, a Child and Family Team (CFT) meeting was held with mother and Ms. Marshall. During the meeting, mother stated she did not believe A.S. was autistic. At some point during the meeting, mother became agitated, ended the meeting, and did not want to reschedule it. Ms.

9

Marshall was "unwavering in her desire and ability to support mother during this time." She was willing to provide a permanent home for the children.

The Department confirmed mother had completed her parenting class and "psychiatric services." Later in April 2024, however, the Department was still working to confirm mother had completed her domestic violence class and was enrolled in individual counseling. Mother was unable to verbalize what she learned in her classes. The Department did not believe mother took the dependency case seriously and did not appear to be bonding with the children.

In June 2024, mother enrolled in an online mental health workshop focusing on parenting for families with children at risk and/or with special needs. Although mother submitted a letter from the program indicating she had attended four sessions, the Department noted not only had mother never mentioned this course to the Department, but the sessions were scheduled at the same time as A.S.'s therapy sessions which mother attended. During those therapy sessions, mother had her phone volume on low in her purse. The Department did not believe mother could participate in both services simultaneously. In the Department's assessment, the online workshop "has not been beneficial to mother at all and suggests that mother is simply going through the motions to check off her participation in a therapeutic service . . . when there has actually been no learning and thus no demonstration of learning through her behavior and parenting."

In August 2024, the Department reported mother was resistant to A.S.'s autism diagnosis and did "not appear to understand the seriousness and importance of participation in focused early intervention." The Department also was concerned with mother's mental health. Mother did not seem to understand or know how to apply what she had learned through her

10

court-ordered services. She did not seem to have a significant bond with the children and, according to the Department, was "not engaging appropriately with the children at all." The Department also continued to suspect mother and father were violating the criminal protective order. During an August 2024 CFT meeting, mother was not genuinely engaged in the meeting and was resistant to parenting suggestions and constructive criticism. She did not believe she needed any help and was "resolute" that she needed nothing but to have her children returned to her care.

### c. Visits

In March 2024, the Department reported scheduling visits had been difficult because of caregiver's schedule, the children's therapy and medical appointments, and "the parents' work and school schedules." The Department asked the court to limit caregiver's ability to terminate visits.

By April 2024, mother's visits became more regular. However, monitors consistently observed mother having difficulty caring for both children at the same time. For example, during one visit, while mother was paying attention to one child, the other child put things in her mouth that are "not supposed to be in a child's mouth." The Department noted, "Mother appears to love the children, and she tries to bond with the children but mother's attention span is limited" and she "appears to lack reasoning and understanding in her parenting skills." In August 2024, the Department stated, "mother still lacks the appropriate parental skills needed to care for both children who are of tender age and require constant supervision."

Nonetheless, in August 2024, the juvenile court granted mother unmonitored visits in a neutral public place. After one month of unmonitored visits, the court planned to order weekend overnight visits for mother.

Mother began unmonitored visits in September and overnight weekend visits in October.

Mother required assistance during her unmonitored visits. During weekend visits, mother called caregiver seeking advice "all the time." Mother struggled to arrive on time for A.S.'s therapy appointments, some of which were canceled due to mother's late arrival. A Department social worker observed mother to react slowly to situations, such as one of her children running away from her. Mother did not seem to understand potential dangers to the children. The social worker thought mother might have a "processing delay."

In November 2024, another CFT meeting was held to assess how overnight visits were going. During the meeting, mother hesitated about having the children returned to her full time, but she indicated she would "be 'OK.'" When told caregiver would not always be available to help, but instead the goal was for mother to reunite with, and to take full responsibility for, the children, mother "appeared to be taken aback." Mother wanted the therapy sessions to be held in the caregiver's home (as they originally had been) because she believed they "went well" there. Eventually and reluctantly, mother agreed to extend the overnight visits through Tuesday evenings. Over the first extended overnight visit, mother "consistently called" the caregiver. The caregiver had to assist mother (over the phone) in keeping the children safe during bath time. By Sunday, mother "was ready for the children to come back to the caregiver."

In December 2024, the juvenile court increased "mother's parenting time to 5 days." However, the court noted, "this does not have to be with both minors at the same time." The Department recommended mother participate in a parenting class focused on caring for children with special needs.

### d. Reunification Services and Placement Options

In March 2024, the Department recommended and the juvenile court granted continued reunification services for both mother and father. In June, however, the juvenile court terminated father's reunification services but continued services for mother. By August, the Department was recommending termination of mother's reunification services.

In June 2024, the court ordered and the Department began the Interstate Compact on the Placement of Children (ICPC) process for assessing Ms. Marshall, who lived in Georgia, as a placement for the children. The court ordered Ms. Marshall to be allowed to participate by phone in medical appointments and therapy sessions for the children, as well as monitored virtual and in-person California visits with the children. The court also ordered an ICPC assessment for paternal grandmother, who lived in Missouri, but her home was denied for placement.

### 5. January 2025: A.S. Returned to Mother's Care Under Department Supervision

In mid-January 2025, the Department filed a report with the court, in which the Department addressed mother's extended time with the children. The Department described instances of mother allowing the children to do whatever they wanted with little, if any, supervision, not attending to the children's safety, not engaging with the children, not understanding the children's needs, not arriving to therapy sessions on time, not grooming the children, not cleaning up after the children, and asking others to assume her parenting responsibilities. Mother denied any concerns. Mother had not been receptive to suggestions from either the Department or service providers and remained unable to verbalize what she had learned in her classes. The Department also noted mother remained unemployed.

13

Mother was not consistently able to care for the children for long periods of time. For example, mother stated she "need[ed] a break from the children and refus[ed] to participate in visits due to having 'low energy.' " Other times, mother called caregiver to pick up a child early. On one occasion, mother yanked A.S.'s arm so roughly that caregiver was called to pick up A.S. and an incident report was filed. Caregiver reported mother was "rude, dismissive, and disrespectful." Mother treated caregiver "as though she [wa]s an employee of the mother" or as "a babysitting service." Caregiver wanted to support mother because of her "extreme concern for the children's safety." However, mother's disrespect toward caregiver strained their relationship to the point that caregiver no longer wanted to be considered mother's support. The Department was "concerned about mother's commitment level and ability to care for two special needs children simultaneously."

Despite its concerns, in January 2025, the Department recommended the children be returned, one at a time, to mother's care under Department supervision. The Department explained, "mother's ability to provide care for her children fall on the line of and/or lies marginally in the range of the legal standard of providing a minimally sufficient level of care." Thus, the Department suggested A.S. be released to mother first, followed sometime later by M.S. Mother would continue visits with M.S. until her anticipated return. The Department also recommended mother participate in a parenting class focused on children with special needs, family preservation services, and recommended services for the children.

On January 22, 2025, the juvenile court ordered A.S. released to mother's care. M.S. remained with caregiver. The court conditioned its home of parent order on, among other things, the Department making frequent

14

unannounced home visits, mother participating in family preservation services provided by the Department, the Department assisting mother in transferring A.S.'s services to mother's home and securing cabinets and doors in mother's home with safety locks.

The next day, mother announced she was going out of town for a funeral and caregiver would take care of A.S. while she was away. However, caregiver was not aware of this and had not been asked. Fortunately, caregiver was able to accommodate mother's request. When mother dropped A.S. off at caregiver's home, A.S. was wearing a wet jacket that mother had washed but not dried and no shoes or socks, despite the cold weather. Caregiver noted there was a dry jacket in A.S.'s bag.

Also in January 2025, the Department received notification of ICPC approved for Ms. Marshall's home in Georgia and the juvenile court sanctioned the Department $250 because it had failed to file a report on time.

By the end of February 2025, mother had been banned from the regional center building where the children received their services. Mother had been asked and warned more than once to drive slowly and safely through the parking structure. Mother continued to drive in an unsafe manner and had an altercation with the parking attendant, which resulted in her ban from the building. In addition, mother repeatedly missed or arrived late to sessions.

In February 2025, the Department reported M.S. had autism, but no details of the diagnosis were provided. Caregiver noted M.S. did not like to be touched on the face. Although caregiver had explained this to mother, caregiver believed mother disregarded M.S.'s needs and tried to show affection toward M.S. by kissing her face and squeezing her cheeks. A Department social worker observed mother doing just that. M.S. participated

15

in "early intervention" as well as speech and occupational therapies, which took place at caregiver's home.

Also in February 2025, "occupational therapy closing reports" were submitted for both A.S. and M.S., which summarized the children's speech and occupational therapy progress and goals. A.S. was delayed in many areas of development and benefitted greatly from occupational therapy. M.S. had sensory needs. She "greatly benefits from strategies and activities that provide oral stimulation, proprioceptive, vestibular and deep pressure input . . . . Parent education regarding sensory integration has been provided to caregivers." Although mother reported to participate during A.S.'s sessions, she did not participate with M.S. For both children, the reports noted no "carryover to the home environment was observed from the biological mother."

In February and March 2025, when A.S. was almost three years old, a clinical psychologist conducted a psychological evaluation to assess whether A.S. was eligible for continued regional center services. Mother failed to bring A.S. to two scheduled appointments. When mother did bring A.S., she arrived 30 minutes late. Mother reported no concerns regarding A.S.'s development. The evaluation found A.S.'s communication skills were "severely delayed," her "global IQ" was classified "as Extremely Low," and her scores demonstrated "Severe Symptoms of Autism Spectrum Disorder." The evaluation stated A.S. would benefit from continued early education services and speech and occupational therapy.

In February 2025, the Department reported, at times, M.S. returned from visits with mother and A.S. with bruises or scratches on her face. Although mother explained the marks resulted from the children playing together, a Department social worker did not believe A.S.'s fingernails were

16

long enough to leave marks on M.S.  However, a social worker had observed the children to play rough with each other.  Caregiver also noted M.S. did not feel comfortable with mother and screamed and cried when dropped off for an overnight visit.  On one occasion, mother dropped A.S. off with caregiver while mother "took care of something."  Mother did not leave caregiver with provisions for A.S. and did not return to pick up A.S. until caregiver called her two days later.

Mother continued to struggle handling both children at the same time.  Mother was described as "not able to attune to her children's needs at the same time," not sufficiently "applying tools learned from her parenting courses," and needing "prompting from others around her to take action with kids or to redirect behavior to keep them safe."  Nonetheless, in its March 2025 report, the Department acknowledged mother had "shown some improvement in being able to provide stability for herself and" A.S.

During an unannounced visit to mother's home in mid-March 2025, a Department social worker spoke with Ms. Marshall, who was visiting mother at the time.  Ms. Marshall told the social worker "mother is not self-sufficient" and wanted Ms. Marshall "to do everything."  Ms. Marshall wanted mother and the children to move in with her but mother did not want to leave California.  At one point during that visit, the social worker grabbed M.S. to stop her from falling while climbing on the table.  During a March visit to an indoor playground, A.S. "disappeared from mother's watch" during the check-in process.  Others in attendance expressed concerns for "mother's lack of urgency to keep an eye on the children as they were playing."

In April 2025, the Department reported due to mother's failures to ensure A.S. attended her therapeutic services, A.S. had "lost gains obtained in closing gaps in her abilities."  Mother's "preferred circumstance" was that

17

she and caregiver could arrange a visitation schedule so that caregiver would in a sense co-parent the children with mother. All of mother's potential future plans included caregiver caring for M.S. and caring for A.S. when mother " 'needs' a break."

In mid-April, because of mother's failures to participate in scheduled sessions and her failure to communicate with the therapist, A.S.'s therapy was terminated. Noting a "crucial window of time" autistic children have to "develop and build upon their abilities," the Department was concerned with mother's "inability to place the needs of the children as a priority" and the severe risk that posed for the children's "behavioral, educational, and speech development." The Department stated mother demonstrated "a disconnect for the high-level needs of her children and what that requires of her as a parent and its impact on her lifestyle." A.S.'s services were reinstated when mother indicated she wanted them to continue. However, on the date they were to resume, mother failed to attend with A.S. Thus, the services were terminated again in early May 2025. As to M.S.'s therapy sessions, due to mother's "threatening" behavior, the therapist was not comfortable working or even speaking with mother.

Upon arrival for an unannounced visit to mother's home in May 2025, a Department social worker observed M.S. walking on the table. The social worker advised mother to get M.S. down from the table and explained to her that M.S. could hurt herself doing that. During the visit, the social worker also told mother a window in her home was a safety hazard for the children. Mother stated the children had never touched the window and could not reach it. When leaving mother's apartment building, the social worker spoke with the building manager. The manager told the social worker mother had e-mailed management a few weeks earlier that her child had thrown items

18

out of the window and needed help retrieving them. The manager also had advised mother to be careful about the window and the children. The manager further stated that on two occasions mother had left the children in her car unattended for unknown amounts of time, "maybe up to an hour." One time the children were left in the car, with the motor running and windows partially down, in front of the apartment building on a busy street, where many transients and people walk by. The manager and security advised mother it was unsafe to leave the children in the car unattended. The manager stated it "appears that [mother] does not comprehend anything that is being told to her."

In May 2025, an initial Individualized Education Program (IEP) meeting was held for A.S., which found A.S. was eligible for special education services based on her autism diagnosis. During the meeting, goals were set toward which A.S. would work, through use of, for example, occupational therapy.

In July 2025, caregiver texted a Department social worker saying A.S. was with her and A.S. had a black eye. When asked by a Department social worker about the mark under A.S.'s eye, mother stated M.S. had hit A.S. with a toy. Caregiver was skeptical of mother's explanation because, when caregiver had both children, they did not interact with each other. The social worker observed A.S. was calmer and more affectionate with caregiver than she was with mother. Caregiver also described a recent instance when mother arrived to pick up both children from caregiver without car seats in her car. Apparently, mother had planned to drive the children home without car seats. Caregiver did not release the children to mother until she had car seats.

A CFT meeting was held in July 2025. Issues discussed included mother's "lack of safety concerns for the children" as well as mother's failing to enroll A.S. in a proper school or follow-up with her IEP. Mother was defensive during the meeting and believed the Department was not helping her with her court-ordered tasks. Ms. Marshall, who was in attendance, said she would help mother enroll A.S. in school and get her to her therapy sessions.

**6.    July-August 2025:  Section 387 Supplemental Petition as to A.S.; A.S. Again Removed from Mother's Care**

In July 2025, the Department reported, "Although mother has completed her court ordered services, mother continues to not understand, nor has she demonstrated the full capacity on how to care for children with developmental delays." The Department further noted mother's difficulty in accepting professional support and guidance, as well as her failure to maintain A.S.'s therapeutic services or enroll her in school. A.S. had regressed in her developmental progress.

In July and August 2025, the juvenile court granted the Department's requests for removal of A.S. from mother's care.[4]  The Department believed mother continued to struggle with "realistic life planning," transparency with the Department (which impeded the Department's ability to assist mother), and ensuring A.S. maintained her regional center services (which had been terminated). Additionally, the Department believed mother demonstrated "a limited protective capacity to care for the child." The Department concluded A.S. was at risk of serious physical or emotional harm in mother's care, thus necessitating removal. On August 8, 2025, the Department detained A.S. from mother and placed her with caregiver, who continued to care for M.S.

---

[4] A "technical glitch" necessitated filing two requests.

20

Soon after, the Department recommended terminating family reunification services for mother. Mother retained a private attorney.

In August 2025, the Department filed a one-count section 387 supplemental petition on behalf of A.S. (A.S. 387 petition). The A.S. 387 petition alleged the previous disposition had not been effective in protecting A.S. The single count addressed A.S.'s autism diagnosis and intellectual impairment as well as mother's failure to maintain A.S.'s regional center services. The Department alleged mother's "inability to provide for the child" put A.S. at risk. In its detention report, the Department noted further threats to A.S.'s safety in mother's care, namely mother had left the children unattended in her car more than once and once planned to drive the children without their car seats. At the initial hearing on the A.S. 387 petition, the juvenile court ordered A.S. detained and ordered mother "to continue compliance with previous case plan." The court granted mother monitored visits and ordered the Department to provide referrals for, among other things, parenting classes for special needs children.

Mother told a Department social worker that, if she could not reunify with the children, "she wouldn't mind if the children went to stay with" Ms. Marshall. Ms. Marshall acknowledged mother had " 'a lot of issues and a lot of personalities' " but Ms. Marshall believed mother loved her children. Ms. Marshall was willing to adopt the children if their parents were unable to reunify. In October 2025, Ms. Marshall officially sought standing in the proceedings below as well as placement of the children with her. Caregiver also was willing to provide permanency for the children. She said "she loved them as if they were her own."

In September 2025, the Department filed its jurisdiction and disposition report regarding the A.S. 387 petition. The children remained in

caregiver's care. Mother told a Department social worker A.S. did not have autism. She believed the Department made up A.S.'s diagnosis and that one of the social workers was jealous of her. Mother did not remember talking to a specialist or psychologist. She said A.S. had a speech delay but otherwise showed no signs of autism and was " 'up to par.' " Although A.S.'s regional center services had expired on her third birthday, mother did not plan to enroll A.S. in her local school (where her services could continue) because mother did not believe A.S. was autistic. When asked about leaving the children in her car unattended, mother replied she did not think that was inappropriate. She also reported she left the children in her apartment unattended because she had " 'things to do.' " She did not specify how long she left them unattended at home but did not think it was inappropriate. Mother also "did not think it was an issue" when she tried to pick up the children from caregiver without car seats. Mother planned to move in with Ms. Marshall in Georgia. Mother was concerned, however, that the Department did not want her to leave and caregiver was " 'trying to keep a check with [her] case ongoing.' " Mother had no interest in participating in additional services. Mother wanted the case dismissed. Although mother and father denied a relationship, the Department remained concerned they continued to see each other.

In August and September 2025, mother had three monitored visits with the children. Mother canceled some of her visits due to health issues and one due to an unknown reason. Mother ended one of her visits early without explanation. During visits, the monitor encountered excessive challenges, including a need for "constant intervention" due to safety issues and mother's "[l]imited parental engagement." The monitor refused to monitor further visits.

By September 2025, caregiver had cared for M.S. for more than two and a half years, since she was approximately four days old. Caregiver cared for A.S. for almost two years before A.S. was released to mother in early 2025. Caregiver again began caring for A.S. after her detention from mother the month before. After returning to caregiver's home, A.S. appeared comfortable and bonded with caregiver. Caregiver told a Department social worker both children had qualified for early intervention services through the regional center. Once A.S. turned three, her services were transferred to the local school. After A.S. returned to caregiver's care, she began attending early education at her local school.

Although mother loved her children, the Department was concerned with mother's rejection of her children's autism diagnoses, her inability to maintain A.S.'s therapeutic services, her rejection of specialized interventions for the children, her lack of judgment or understanding of appropriate levels of supervision for young children, her inability to assess risk and danger, and her limited engagement with the children. A.S. was "entirely dependent" on mother and, due to A.S.'s speech delay, was limited in her ability to communicate or seek help. The Department noted that despite approximately 22 months of family reunification services with "extensive support and opportunities to address" case issues, mother had not demonstrated any "capacity to implement and sustain the skills and services necessary to provide ongoing safe and stable care for the child."

In October 2025, the family's "Family Preservation provider" reported that mother "was becoming increasingly disengaged" and had a "flat affect" during the most recent three sessions held in July and August 2025. The Family Preservation provider noted the children had "high needs," often climbed on cabinets and tables, and were physical with each other. It was

often necessary to instruct mother to intervene when the children needed assistance. Mother had not fully accepted M.S.'s autism diagnosis and did not understand her needs.

Although in mid-October 2025, the Department had encouraged the juvenile court to consider placing the children permanently with caregiver, in a later October report, the Department recommended "the children be immediately replaced to the home and care of [Ms.] Marshall as per ICPC agreement." It was mother's desire that, if she was unable to reunify with the children, the children be placed with her "mother," Ms. Marshall, in Georgia. Ms. Marshall was ready and willing to bring the children into her home.

## 7. October 21, 2025 Hearings

On October 21, 2025, A.S.'s case was on calendar for adjudication of the A.S. 387 petition and a section 364 review, while M.S.'s case was on calendar for a section 366.22 review hearing. We refer to these hearings as the October 2025 hearings.

### a. Adjudication of the A.S. 387 Petition

The Department recommended the juvenile court sustain the A.S. 387 petition, remove A.S. from mother, provide no reunification services to mother (because she had exhausted the reunification timeframe), and schedule a permanency planning hearing. Counsel for A.S. agreed with the Department's recommendation. Mother's counsel objected to the Department's recommendation. Counsel argued A.S. should continue in mother's home "as long as conditions no longer exist which brought this case to the court under section 364." Counsel did not believe the Department's "concerns about mother's enrollment of [A.S.] in therapy" presented substantial risk of harm to A.S. Counsel did not "think that it is the case

24

that conditions still exist." Counsel urged the court not to remove A.S. from mother's care.

The juvenile court amended the A.S. 387 petition to reflect that cancellation of services and failure to participate in services caused regression in A.S.'s speech and behavior. The court found A.S.'s regression "does present risk of harm to [A.S.]" The court sustained as amended the one count of the A.S. 387 petition (i.e., count s-1), removed A.S. from mother, and terminated the previous home of mother order. The court found the previous disposition had been ineffective in resolving the issues that brought A.S. to the court's attention. The court took the section 364 review hearing off calendar.

After the court sustained the A.S. 387 petition as amended, counsel for mother asked the court to place A.S. with Ms. Marshall, who was present in the courtroom with her attorney. The Department joined in the request. Ms. Marshall's attorney also requested placement with his client or, in the alternative, an extended trial visit. Although counsel for A.S. was not opposed to placement with Ms. Marshall, counsel asked that A.S. remain with caregiver until further information could be obtained as to A.S.'s best interests. Before deciding placement or the status of reunification services, the court heard argument as to the review hearing for M.S.

**b.     Section 366.22 18-month review hearing for M.S.**

As to M.S., the Department recommended terminating reunification services for mother. Counsel for the Department argued, "despite the level of services mother has been provided with this long period of time, mother hasn't achieved what she needs to be able to provide a safe environment" for the children. Counsel for M.S. agreed. Counsel for mother, on the other hand, argued services should continue and M.S. should be placed in mother's

care. Counsel claimed the Department had not shown detriment if M.S. returned to mother's care. Counsel acknowledged the challenges mother encountered caring for her children (e.g., attendance at therapy sessions, climbing on furniture) but did not believe those showed detriment. Rather, counsel stated, "It just indicates mother has the challenge of raising special needs children." Counsel also argued, "if the Department is concerned about mother following through on some of these issues that the kids need, the court can continue the matter for an appearance progress hearing to see how things are going at that time."

The juvenile court noted mother was in substantial compliance with her case plan. Nonetheless, the court determined returning M.S. to mother's care would create a substantial risk of detriment. The court noted, "We are now at the 31 month mark for [M.S.]" and everyone's hard work, including mother's, "has not been successful."

The court terminated reunification services and scheduled a February 17, 2026 section 366.26 permanency planning hearing for both children. In the interim, the court ordered a short visit for the children with Ms. Marshall in Georgia as well as a section 361.3 hearing to address placement with Ms. Marshall.

8. **Petition for Extraordinary Writ and Stay of Section 366.26 Hearing**

In October 2025, mother filed her intent to file a writ petition. In December 2025, mother filed the instant petition for extraordinary writ, in which she claims the juvenile court erroneously terminated her reunification services. Mother asks us to "find the trial court erroneously terminated [her] reunification services, vacate all findings and orders relating to the termination of reunification services, vacate the order for the *section 366.26*

26

hearing and remand the matter back to the trial court." We issued an Order to Show Cause and granted mother's request for stay of the February 17, 2026 permanency planning hearing. The Department and both children oppose mother's petition for extraordinary writ.

## DISCUSSION

Mother makes several arguments in her petition for extraordinary relief. A few of those arguments, however, have been forfeited because she did not first make them before the juvenile court. "In order to preserve an issue for appeal, a party ordinarily must raise the objection in the trial court." (*In re S.C.* (2006) 138 Cal.App.4th 396, 406.) Mother did not argue below that the court (1) should have terminated jurisdiction, (2) violated her due process rights by failing to ensure she had visits with her children, or (3) failed to find the Department had provided reasonable reunification services to her. We agree with the Department and counsel for the children that by failing to raise those arguments below, mother has forfeited them. (*Ibid.*) Thus, we do not address those arguments.[5]

We turn to mother's remaining arguments.

### 1. A.S.'s Services and Therapies

The most cogent argument mother makes concerns her failure to continue and support A.S.'s regional center services while A.S. was in her

---

[5] Moreover, with respect to her visitation and due process argument, mother also fails to cite either to the record or to legal authority supporting her position, thus further forfeiting the issue. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.) Indeed, in the entirety of the argument section of her memorandum, despite discussing the factual record, mother not only fails to include a single citation to the record but also repeatedly and improperly misrepresents the record and omits facts that are not helpful to her. (See Cal. Rules of Court, rules 8.204(a), 8.412(a)(2), 8.452(b).) "An appellant must fairly set forth all the significant facts, not just those beneficial to the appellant." (*In re S.C.*, at p. 402.)

care during 2025.  Mother concludes it was error for the juvenile court to "continue[] jurisdiction based on the Petitioner not attending regional services and certainly should not have set the matter for a *WIC §366.26* hearing."

Mother's position is untenable.  Most notably, she provides no relevant legal framework for her argument.  She quotes extensively from one case to highlight unassailable propositions such as "parental autonomy is constitutionally protected" and "State officials may interfere in family matters to safeguard the child's health, educational development and emotional well-being." (*In re Phillip B.* (1979) 92 Cal.App.3d 796, 801.)  The quoted case, however, concerns the propriety of jurisdiction under subdivision (b) of section 300, which is not pertinent here.  Although at the October 2025 hearings, the juvenile court considered the A.S. 387 petition, mother does not reference let alone discuss section 387 in the entirety of her petition or supporting memorandum.  However, mother does reference section 361, which, as discussed below, is applicable here.

"A section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.)  Importantly, "[a] section 387 petition need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists.  [Citations.]  The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*Ibid.*)  At the October 2025 hearings, the A.S. 387 petition was on calendar for adjudication.  Thus, the juvenile court was considering "whether the factual allegations of the supplemental petition [were] true and whether the previous disposition ha[d]

28

been ineffective in protecting the child." (*Ibid.*)  Once the court found the allegation true, it turned to disposition to determine whether removing A.S. from mother was appropriate under section 361.  (*Id.* at pp. 1161, 1163.)

Section 361 authorizes the removal of a dependent child from parental custody when the juvenile court finds, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from" the parent's physical custody.  (§ 361, subd. (c)(1).)  Removal under section 361 is appropriate if the parent cannot provide proper care for the child and there is potential detriment to the child if she remains in the parent's care.  (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1163.)  "The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child."  (*Ibid.*)

We review the jurisdictional findings and dispositional orders for substantial evidence.  (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1161.)

Under the applicable legal framework, it is clear substantial evidence supports the juvenile court's order sustaining the A.S. 387 petition and removing A.S. from mother's custody.  As to adjudication, the record fully supports the court's findings that A.S.'s speech and behavior regressed due to mother's failure to maintain A.S.'s therapeutic services.  Mother failed to bring A.S. to services on time, she missed appointments altogether, she alienated service providers, she was banned at certain locations, and she failed to enroll A.S. in school so that her services could continue.  Ultimately, A.S.'s services were cancelled and her speech and behaviors regressed.  Thus, after spending seven month's in mother's care in 2025, it was clear the

29

previous disposition (i.e., home of mother) had not been effective in protecting A.S.

As to disposition and removal, the record also amply supports the court's order. The record reveals there was a substantial danger to A.S.'s physical and emotional well-being if she were to remain in mother's custody. As already noted, A.S.'s speech and behaviors had regressed during her time in mother's care. Had A.S. stayed in mother's care, there was every reason to believe A.S. would continue to regress. Mother did not believe A.S. was autistic. There was no indication mother would at some point begin to support A.S.'s therapies. Despite years of assistance and support, as well as completing various court-ordered programs, Mother simply did not understand or appreciate the importance of specialized therapeutic interventions for A.S. As a result, A.S.'s development and safety suffered. The court did not err in removing A.S. from mother's care.

To support her position, mother states she was never asked if she wanted A.S. to participate in regional center services, the Department "just assumed it was in [A.S.'s] best interest," the Department substituted the social worker's judgment for that of mother, and the Department improperly asked for removal and termination of parental rights. Mother also argues, "this was nothing more than speech therapy and occupational therapy; and not receiving it was not going to cause [A.S.] significant harm, physical injury, or death." These statements are neither supported by citation to the record nor are they accurate.

First, no one asked for termination of parental rights and mother's parental rights have not been terminated. Second, the Department's position, as well as that of the children's counsel and the court, was neither "just" an assumption nor a substitution of a social worker's judgment for that

of mother. The decision to enroll A.S. in regional center services was based on professional medical advice. A.S. was assessed by a doctor and found to have autism, PICA, speech delay, developmental delays, and aggressive behaviors. Under "treatment required" for A.S., her doctor listed speech therapy, occupational therapy, and ABA therapy. A clinical psychologist also examined A.S. and found her to have severe symptoms of autism spectrum disorder, an "Extremely low" IQ, and severely delayed communication skills. The psychologist stated A.S. would benefit from continued early intervention services, speech therapy, and occupational therapy. In addition, A.S.'s therapists recommended consistency and a safe environment for A.S. Indeed, the facts bear this out. When A.S. missed her services and therapies, her behavior and speech regressed. Third, to characterize A.S.'s services as "nothing more than speech therapy and occupational therapy" demonstrates a profound misunderstanding of the child's diagnoses and needs. As the record reveals the therapies were designed to assist A.S. to communicate and regulate her behavior. It goes without saying, these are essential life skills and, as the juvenile court found, lacking them can cause safety issues.

Finally, although not a part of the section 387 analysis, mother nonetheless references in this same section of her memorandum the court's order setting the matter for a permanency planning hearing under section 366.26. Mother concludes, without analysis, that "not attending regional services" did not support setting "the matter for a *WIC 366.26* hearing." Despite the lack of analysis, we briefly address this issue—i.e., termination of reunification services and the setting of a permanency planning hearing.[6]

---

[6] Counsel for M.S. argues mother has abandoned this issue because she fails to support it with legal authority or reasoned analysis. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.) While true, we nonetheless address the issue briefly because it is ostensibly the reason for the instant petition.

The applicable legal standard is found in section 366.22, which provides, "the court shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) We review the court's detriment finding for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)

The section 366.22 "substantial risk of detriment" standard is similar to the "substantial danger" standard found in section 361, which we discussed above. For the same reasons discussed above, we conclude substantial evidence supports a finding of substantial risk of detriment if the children were placed with mother. Moreover, the record is replete with further evidence supporting the detriment finding. For example, despite years of assistance, mother continued to demonstrate a serious lack of judgment when it came to her young, autistic children's safety. Mother left the children alone in her car on at least two occasions, once with the engine running, she left the children alone in her apartment, she did not notice when the children were climbing on furniture and about to fall, and although she denied it, the record suggests mother allowed the children access to a dangerous window in her apartment. Despite completing her court-ordered services, mother never was able to articulate what she had learned.[7] Throughout the underlying proceedings, mother was described as being unable to handle or care for both

Although not briefed by mother, both the Department and M.S. address it in their briefs.

[7] "Compliance with the reunification plan is certainly a pertinent consideration at the section 366.22 hearing; however, it is not the sole concern." (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704.)

children at the same time.  She consistently denied any safety concerns, including when she left newborn M.S. unclothed and unattended in her apartment.  Unfortunately, as the juvenile court noted, everyone's hard work, including mother's, had been unsuccessful.  Suffice it to say, the record amply supports the juvenile court's decision.

## 2.    Other Arguments

It is difficult to make out mother's remaining arguments.  One argument falls under the heading, "The Juvenile Court Lacked Substantial Evidence in Making Its' [*sic*] Findings and Orders."  Here, mother addresses subdivision (b)(1) of section 300.  She appears to argue substantial evidence did not support jurisdiction under that subdivision.  However, that subdivision was not at issue at the October 2025 hearings.  The time to challenge the court's jurisdictional findings under section 300, which were made in November 2022 and September 2023, has long since passed.

Another argument comes under the heading, "The Court erred when it continued jurisdiction over the minors due to domestic violence."  Here, mother addresses domestic violence and removal under section 361, then switches to a discussion of domestic violence and jurisdiction under section 300.  Domestic violence was not an issue at the October 21, 2025 hearings.  The juvenile court did not rely on or even address domestic violence during those hearings.  And, as already noted above, jurisdiction under section 300 was not at issue.  Thus, these points are irrelevant and we do not address them.

**DISPOSITION**

The petition for extraordinary relief is denied.  This opinion shall become final immediately upon filing.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


RICHARDSON, J.